Filed 4/2/20; Certified for Publication 4/16/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| 501 EAST 51ST STREET, LONG-BEACH-10 LLC,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>KOOKMIN BEST INSURANCE CO., LTD., et al.,<br><br>    Defendants and Respondents. | B293605<br><br>(Los Angeles County Super. Ct. No. NC061176) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.
        Donahoo & Associates, Richard E. Donahoo; Esner, Chang & Boyer, Stuart B. Esner and Holly N. Boyer for Plaintiff and Appellant.
        De La Peña & Holiday, Gregory De La Peña and K. Anderson Franco for Defendants and Respondents.

* * * * * * * * * *

This is an insurance bad faith lawsuit. Plaintiff 501 East 51st Street, Long Beach-10 LLC appeals the judgment following summary adjudication in favor of defendants Kookmin Best Insurance Co., Ltd., doing business as Leading Insurance Company, and Leading Insurance Group Insurance Ltd., doing business as Leading Insurance Company, on plaintiff's claim for breach of the covenant of good faith and fair dealing relating to the parties' insurance contract. Plaintiff sued after defendants denied plaintiff's claim for damages to its Long Beach apartment complex allegedly caused by a ruptured underground water main. Experts hired by plaintiff and defendants provided conflicting reports on the cause of the damage. We agree with the trial court there is no material dispute whether defendants denied the claim in good faith based on an expert report concluding the damage was not caused by the broken water main, and affirm the judgment.

## BACKGROUND

Plaintiff sued defendants for breach of the covenant of good faith and fair dealing, fraud in the inducement, breach of contract, estoppel, negligence, negligent misrepresentation, and declaratory relief based on defendants' denial of plaintiff's insurance claim.

Defendants moved for summary adjudication of plaintiff's claim for breach of the covenant of good faith and fair dealing. Defendants argued the "genuine dispute doctrine" provided a complete defense to a finding of bad faith. Defendants presented evidence the denial of plaintiff's claim was based on expert opinions that the damage to plaintiff's building was caused by long-term settlement and earth movement, which was not a

2

covered loss under the policy. The parties do not dispute that settlement-related damage was not covered under the policy.

## 1.    Facts Supporting the Summary Adjudication Motion

### a.    Plaintiff's insurance claim and expert report

The subject property is a 10-unit, two-building apartment complex, built in 1963. Plaintiff purchased the property in 2012, and defendants first issued a policy insuring the property in 2013.

Sometime between December 31, 2015 and January 2, 2016, an underground water main burst next to the southwest side of the building. Plaintiff alleged the "building moved and cracked because of the soil movement triggered by the pipe failure."

Plaintiff presented its claim to defendants on March 8, 2016, claiming damage to the building caused by the ruptured water main. In April 2016, plaintiff provided defendants with a report prepared by American Geotechnical, Inc. (AGI). AGI performed a "limited geotechnical investigation" of the property to "evaluate site conditions relating to the reported building distress following a waterline break near the south end of the building." The scope of the evaluation was limited to "observation, photo documentation of the site conditions, [and] a floor-level survey of the interior of the first level units . . . ." The investigation did *not* involve any subsurface investigation or soil testing.

The report noted cracks in the interior walls and the concrete slab floors of units 1 and 4. Regarding the exterior of the building, the report noted "significant cracks on the foundation stem wall in the south side of the building near the reported water leak." There were also "[n]umerous stucco

3

cracks." The report noted "significant floor deformation," with "downward tilting to the rear as well as to the right and left sides of the building. The steepest floor tilt . . . occurs at the left side of Unit 1, close to the reported water leak."

AGI opined that "existing building distress was substantially contributed to by the water main break. The water introduced to the soil medium appears to have triggered differential foundation movement causing the stress features to develop. Some of the distress may have pre-existed and be due to longterm soil influences as well as inadequate original design and/or construction. [¶] Further investigation including soil sampling and testing can be performed to determine the site soil conditions."

AGI recommended the building's foundation be reinforced with piers, going at least 20 feet deep, as well as repairs to the slab foundation. The preliminary cost to repair the damage, and relocate tenants, was estimated to be $258,900.77.

**b.    Defendants' investigation and expert**

At the time the claim was tendered, David Koch was defendants' Property Supervisor. He was responsible for determining whether the loss was covered under plaintiff's policy, and to retain experts to help make that determination. Irene Bernardo worked under Mr. Koch, administering the investigation of the claim.

After receiving AGI's report and repair estimate, defendants retained J.S. Held LLC, a construction consulting firm, to assist in investigating the claim. Upon J.S. Held's recommendation, defendants also retained Wiss, Janney, Elstner Associates (WJE) to inspect plaintiff's property and determine the cause of the damage.

4

On June 4, 2016, WJE associates Ann Harrer and Adrienne Goetz conducted a site survey. John Machin, a cost estimator with J.S. Held, and plaintiff's representative, Alex Stamires, were also present during the site survey.

WJE issued its report on June 29, 2016, detailing its investigation and findings. As part of its investigation, WJE reviewed AGI's report, and inspected the interior and exterior of the complex. WJE did *not* conduct any soil tests. According to the report, Mr. Stamires told WJE the water line supply break occurred three to four feet underground, at the southwest corner of the building. During a two- or three-day period, water leaked from the broken pipe, creating a mud slurry that traveled along the western façade of the building, and down a sloped embankment away from the building.

WJE noted numerous previous repairs to the stucco on the building, at the west and south facades, and near the water leak. Mr. Stamires informed WJE that no exterior repairs or repainting had been done since the property was purchased in 2012. WJE noted that "[a]t some locations, particularly at the sound end of the main building, some of the [previously repaired] cracks have opened up . . . ."

Unit 1 is a ground floor apartment, closest to the leak. The glass for unit 1's window had been replaced with an acrylic sheet, as the glass for the unit had broken three times since the pipe break. Sealant had been applied to a crack on the bottom of the window frame following the pipe break, and the crack had widened since its application because the crack was no longer sealed. Cracks were noted throughout the interior of the apartment, but were predominantly in the southwest bedroom closest to the water leak, and the living room. The tenants

reported that they had filled drywall cracks emanating from the corner of a closet door following the pipe leak, but that the cracks had since widened. Also, the door to their unit was sticking, and there was "vertical offset" of the slab floor in the living room which was not noticeable before the leak. The floor noticeably sloped to the south.

WJE concluded that "[t]he previously repaired interior and exterior cracking, and the [floor level] survey performed by [AGI], indicate that away from the vicinity adjacent from the reported water supply line break location there are changes in elevation across the slab of the main building. The changes in elevation noted indicate that at least some settlement and movement of the building occurred prior to the water supply line break event and subsequent running water from the broken line. However, the reopening of previously repaired cracks, presence of open cracks, observed discontinuity with vertical offset in Unit 1, and the multiple occurrences of glass breakage of the window in Unit 1 as reported by residents, indicate that there has been some movement or settlement of the building since the early 2016 water supply line break event. Existing settlement-related conditions were likely exacerbated as a result of the water released due to the supply line break. However, it is of note that there has been ongoing, general settlement of the building, downwards towards the west, which will likely continue, and which is not a result of the recent water supply line break and subsequent running water."

WJE recommended that "floor finishes in Unit 1 be removed to investigate further the noted floor slab discontinuity and vertical offset. This investigation should be completed to determine potential extent of distress as well as to determine a

6

repair procedure." WJE made no recommendations on how the damage should be repaired.

### c. **Defendants retain coverage counsel**

On June 30, 2016, defendants retained Mark R. Israel of Daniels, Fine, Israel, Schonbuch & Lebovits, LLP to provide legal advice regarding coverage for the damage under the policy. Mr. Israel was asked to determine whether there was coverage for plaintiff's damages under the "efficient proximate cause" standard. He reviewed the policy, and the AGI and WJE reports.

On July 27, 2016, Mr. Israel provided defendants with an opinion letter summarizing his conclusions. Under the policy, damage to the building caused by earth movement and settlement are excluded, but water damage resulting from an "accidental discharge" of water was covered. He noted that both AGI and WJE agreed there was "pre-existing, ongoing general settlement" of the building. He noted that "there are a number of candidates for the 'efficient proximate cause' of loss," but that "both experts concur that the water leak set in motion forces that seriously exacerbated the preexisting condition of the property and likely caused new damage."

Mr. Israel ultimately concluded "damage to the insured apartment building attributable to the recent water line break is covered. There was undoubtedly pre-existing settlement and cracking at the insured location. To the extent the experts can reasonably segregate the repair cost between the two types of damage, then coverage would exist only for damage allocable to the pipe break." He recommended that "in addition to having your experts assess that issue, you may wish to request water usage records from the insured location to verify that this leak

7

was a sudden occurrence in the December-January time frame as opposed to a chronic condition at the property."

### d.    Defendants seek further expert opinions

Because neither the AGI nor the WJE reports provided a definitive opinion that the water main break was the efficient proximate cause of the damage, on September 16, 2016, Mr. Koch requested that WJE perform additional testing.  Also, on October 5, 2016, defendants retained Geotechnical and Environment Sciences Consultants, Ninyo & Moore.  Ninyo & Moore provided a report on December 6, 2016, and on December 5, 2016, WJE provided a supplemental report.

Ninyo & Moore visited the site on October 11, 2016, reviewed the regional geological setting and site geology, and conducted "subsurface exploration consisting of the excavation, logging, and sampling of two hand excavated test pits and four hand-augered exploratory borings around the subject building."  Soil samples were taken from the borings and test pits and sent to a laboratory for testing.

Ninyo & Moore observed numerous previously patched cracks in the stucco.  Some of those cracks experienced "minor re-opening."  They also inspected the exposed slab floor in unit 1, and noticed large cracks in the concrete.  The "slab cracks were generally noted to have aged characteristics including rounded and worn edges," and were filled with debris.  They also noted that "topping slab/replacement slab" had been applied to the southwest bedroom floor, attempting to level the sloping floor.

Ninyo & Moore formed the following opinion:  "Based on our evaluation, the cracks in the walls and floor slab and the tilt of the floors of the subject building were caused by long-term differential soil movement. The soil movement that has affected

8

the building is attributable to settlement of soils along the west side of the building, as indicated by the low areas and contour pattern of the . . . floor level survey . . . , and heave of expansive clayey soil under the eastern portion of the building.  Based on our site observations, the settlement is related to the poor surface drainage conditions observed along the west side of the building. Long-term infiltration of water into the foundation soils on the west side of the structure due to roof runoff and incident rainfall has resulted in long-term settlement in this area."

"Based on our evaluation, we conclude that the reported December 31, 2015, pipe leak did not contribute to the tilt of the building floor or the cracks in the building.  The tenants of the building reportedly observed water from the leaking pipe flowing into the drainage channel property to the north of the subject site.  Based on our . . . surveying around the southwest part of the site, surface drainage in the vicinity of the reported pipe leak location would tend to flow away from the building toward the south and west into the drainage channel property adjacent to the subject site. . . .  This suggests that water from the leaking pipe escaped to the ground surface and flowed away from the building and that a significant amount of water did not infiltrate the subsurface soils at the location of the leak.  Additionally, the tilt of the slab-ongrade is relatively consistent from the south end of the building to the north end and cracks in the building walls were observed to be widespread across the structure. . . .  We did not observe indications that the distress was isolated at the location of the reported pipe leak at the southwest corner of the building. . . ."

As part of its supplemental report, WJE reviewed water bills for the subject property for the months between August 2015

and January 2016. The January bill reflected water use that was 9,500 gallons higher than previous months. WJE also inspected the exposed slab floor for unit 1, and noticed significant cracking, and that topping cement had been added to the southwest corner of the bedroom. WJE used ground penetrating radar (GPR) to examine the conditions below the slab. "GPR surveys performed in several locations throughout the exposed slab revealed that the slab is largely unreinforced, and as a result, does not have the tensile strength to resist differential movement, which results in cracking. Some areas of the slab exhibit evidence of previous repairs."

WJE concluded that "the previous repairs to the exterior cracks and evidence of the slab-on-ground cracking indicates that the cracks initiated prior to the water supply line break of December 2015. Previous repairs to the exterior walls and interior slab also indicate that ongoing attempts to mitigate the long-term settlement of the building have occurred, including installation of a topping or leveling material in the bedroom. In conclusion, there has been ongoing, general settlement of the building, downwards toward the south and west, resulting in the observed cracking in the slab and walls of Unit I, which will likely continue without remediation of the conditions that are causing this settlement, and which is not a result of the December 2015 water supply line break and subsequent discharge of water."

Mr. Israel reviewed both the Ninyo & Moore report and WJE's supplemental report, and on December 7, 2016, Mr. Israel forwarded these reports to plaintiff.

On January 23, 2017, plaintiff provided defendants with a 2012 property inspection report which had been prepared in

connection with plaintiff's purchase of the property. The report noted cracking and bubbling in the stucco requiring repairs and further evaluation, and problems with the window in unit 1. The window would fall out of its tracks and required further evaluation. The inspector also noted cracking in the drywall, and that the slab in unit 4 is "badly cracked and feels as though the crack is offset. Cause of the cracking is unknown and . . . needs to be determined."

### e. Defendants deny plaintiff's claim

After reviewing all these reports, Mr. Israel prepared a second coverage evaluation concluding the "efficient proximate cause of the foundation damage was long-term differential soil movement which cause of loss is explicitly excluded by the terms of the policy." Mr. Israel sent this coverage opinion to plaintiff on February 6, 2017.

## 2. Plaintiff's Facts in Opposition to Summary Adjudication

Plaintiff argued there were triable issues as to whether there was a "genuine dispute," reasoning there was ample evidence from which a jury could conclude that defendants "acted unreasonably and that [their] investigation was biased." Specifically, plaintiff argued that the property was in good condition when it was purchased and when defendants first extended coverage to plaintiff; WJE initially *concurred* with plaintiff's expert that the leak caused new damage to the building; defendants received an initial coverage opinion that there was coverage under the policy that defendants did not disclose to plaintiff; the decision to extend coverage changed when defendants received a higher than expected estimate to repair the damage; WJE changed its opinion without conducting

11

any further investigation; new experts were hired only to "pursue coverage denial"; and defendants anticipated litigation, from which it could be inferred their denial was in bad faith.

### a. Condition of property at time of purchase

In 2013, defendants had the property inspected as part of their due diligence before issuing an insurance policy. The report, written by E&S Inspections, Inc. provided no in-depth description of the condition of the property, but instead noted that the property was in "satisfactory" or "average" condition, and included 11 general photographs of the building, none of which included sufficient detail to show cracking to the building's stucco or settlement of the building.

Mr. Koch testified in his deposition that if the inspection revealed "apparent damage or issues," an insurance policy would not likely have been issued. He also testified that the 2013 report was not provided to defendants' experts, WJE and Ninyo & Moore.

### b. Defendants initially decided to extend coverage

Claim file notes entered on July 26, 2016 by Ms. Bernardo recorded that Mr. Israel "[j]ust completed the analysis, we will extend coverage to unit 1 only, he wanted to see previous water bill for this property first for review then finalize[] his report, submit to KBIC Mr. Koch and move forward."

Plaintiff provided the water bills to defendants on August 8, 2016. That same day, Mr. Machin, the cost estimator with defendants' construction consulting firm, told defendants in his opinion, "9,537 gallons more in the month of December-January over the monthly average . . . is representative of enough water to cause the settling and deformation described."

12

August 10, 2016 notes in the claim file record that Mr. Israel told defendants that if the experts agreed the water line break caused the damage to plaintiff's property, the next step would be to "formulate cost[s]" of repair. *However, he cautioned that further investigation might be warranted.*

Defendants provided the water bills to WJE, and on August 16, 2016, WJE informed defendants that the water bills did not change their findings from their earlier report that pre-existing settlement of the building "was likely exacerbated as a result of the water supply line break." WJE also maintained that settlement of the building would likely continue, unrelated to the water line break.

According to Mr. Stamires, defendants did not provide plaintiff with WJE's initial June report which stated in part, "Existing settlement-related conditions were likely exacerbated as a result of the water released due to the supply line break." Moreover, "[t]he Carrier never disclosed to me the decision to extend coverage in July 2016" or that they asked "Mr. Machin to prepare an estimate for repair of damages related to the loss." Defendants also did not give Mr. Israel's July coverage opinion to plaintiff. Mr. Israel advised defendants that the letter was for their use, and that the opinion was privileged.

### c. J.S. Held LLC prepares repair estimate

On July 27, 2016, defendants forwarded a copy of WJE's June report to Mr. Machin of J.S. Held LLC "so he can start writing estimate for unit 1." According to July 28, 2016 notes in the claim file, Mr. Machin told defendants there were "lots of issues" with writing an estimate for unit 1. He recommended further evaluation by the engineers, including evaluation of the slab to "get a better picture and write a report" of the damage.

13

On September 3, 2016, Mr. Machin provided an estimate to repair unit 1 to his colleague at J.S. Held, Mr. John Gillen. The total repair costs for unit 1 were estimated to be $227,752.90.

On September 5, 2016, Mr. Gillen emailed Mr. Machin, asking him to "clarify the extent of slab replacement and releveling" because the estimate was "more than . . . expected and quite a bit more than the Insured's estimate, so I want to be sure before we send."

On September 8, 2016, Mr. Machin discussed the estimate with defendants, and again explained there were a lot of "unknowns" that made providing an estimate difficult, and that WJE had not recommended the scope of work or how to repair the damage to the building. He suggested having a conference call with defendants, Mr. Gillen, WJE, and Mr. Israel to discuss how to proceed.

The conference call was held on September 9. Mr. Machin expressed concerns that "there is something going on [in] the middle of the building that we do not know" and that there was extensive settlement on the north side of the building, away from the pipe leak. The parties decided that WJE would write a proposal for further investigations so that they "can tell for sure if all the cracks are related to [the water pipe leak] or . . . settlement."

### d.    Defendants hire new expert

Ms. Harrer with WJE sent a proposal to perform additional investigations to J.S. Held on September 13, 2016. She recommended that the floor finishes in unit 1 be removed so that the floor could be further investigated. She proposed that WJE visually survey the exterior of the building for any noticeable changes since its June investigation. WJE would use GPR to

14

determine the condition of the slab including its thickness and reinforcement. WJE's investigation would not include samples or material testing, but these services were recommended.

In addition to this proposal, Ms. Harrer cut and pasted some background information from WJE's June report. Other than reviewing the water bills, and participating in the September 9 conference call, WJE had not performed any additional investigations since its June report. Nevertheless, the proposal phrased some matters differently than the June report. For example, the proposal substituted the term "may" for the phrase "has been" in stating that there "may have been some movement or settlement of the building since the early 2016 water supply line break event." Ms. Harrer also tempered her previous conclusion that "[e]xisting settlement-related conditions were likely exacerbated as a result of the water released due to the supply line break," by adding, "however, the extent of damage, if any, caused by the January 2016, even[t] are not known at this time" to the end of the sentence.

According to Ms. Bernardo, it was Mr. Koch who suggested that new experts be hired. On October 3, 2016, she wrote an email to Mr. Koch asking him to approve Ninyo & Moore's budget of $15,000. On October 5, 2016, Mr. Koch responded by asking "Why is budget so expensive?" Later that same day, Mr. Koch approved the budget, writing to Ms. Bernardo, "Seems expensive in pursuit of coverage denial. OK for engineer."

e.      **Defendants deny claim**

In December 2016, following the receipt of reports from WJE and Ninyo & Moore, the claim file includes notes indicating a "potential lawsuit" and "this file will be in

15

litigation." The context for these notes was that the reports concluded the damage was not attributable to the water main break, and that the coverage attorney, Mr. Israel, was going to provide these reports to plaintiff.

### f. Plaintiff seeks denial of motion pursuant to Code of Civil Procedure section 437c, subdivision (h)

Plaintiff argued the motion should be denied under section 437c, subdivision (h), because defendants' person most knowledgeable about the investigation and denial of plaintiff's claim, William Walker, was instructed by counsel not to answer 53 questions during his July 20, 2018 deposition. Specifically, he refused to answer "Was the denial of the claim appropriate?" Counsel objected that the question improperly called for expert opinion.

Plaintiff's counsel's declaration in support of the opposition averred: "The refusal of Defendant to answer questions in deposition prevented me from obtaining essential discovery regarding the denial of the claim, which I would have found useful in preparing the opposition to this motion." "There were other similar questions to which the PMK witness was so instructed and refused to answer. The instruction and refusal to answer each of the 53 questions severely limited the usefulness of the deposition and was prejudicial to Plaintiff in that facts essential to justify opposition may exist but cannot, for reasons stated, be presented. On this ground alone, per CCP §437(c)(h) the Court should deny the motion and make any other order as may be just."

16

### 3. Defendants' Reply

Defendants' reply argued that plaintiff's evidence did not show that defendants acted unreasonably, or refute their evidence that there was a genuine dispute. The reply did not address plaintiff's argument that the motion should be denied pursuant to section 437c, subdivision (h).

### 4. Trial Court's Ruling

The trial court granted the motion, finding defendants had satisfied their burden under the genuine dispute doctrine, and that plaintiff's opposition evidence did not raise a triable issue of material fact. The trial court's ruling did not address plaintiff's request for denial of the motion under section 437c, subdivision (h). Plaintiff dismissed its remaining claims without prejudice, judgment was entered in favor of defendants, and this timely appeal followed.

## DISCUSSION

"[T]he party moving for summary judgment [or adjudication] bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to [that] cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.) The party opposing summary judgment "shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (§ 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact

17

to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542; *Aguilar, supra*, 25 Cal.4th at p. 854.) It is no longer called a "disfavored" remedy. "Summary judgment is now seen as a 'particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Perry,* at p. 542.) On appeal, "we take the facts from the record that was before the trial court . . . . ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037, citation omitted.)

### a. Genuine dispute doctrine

California law requires insurers to pay for covered losses caused by an insured risk. If a loss was caused by more than one occurrence, including covered and not-covered events, then the insurer is liable only if the "efficient proximate cause" or the "predominate" cause was a covered risk. (*City of Carlsbad v. Insurance Co. of State of Pennsylvania* (2009) 180 Cal.App.4th 176, 183.)

" 'Before an insurer can be found to have acted in bad faith for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause.*' . . . 'Where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for

18

advancing its side of that dispute.' . . . [¶] 'The "genuine dispute" doctrine may be applied where the insurer denies a claim based on the opinions of experts.' . . . Reliance on an expert . . . 'will not automatically insulate an insurer from a bad faith claim based on a biased investigation.' . . . Although an insurer may rely on experts, summary judgment on a bad faith claim must be denied where the evidence shows 'the insurer dishonestly selected its experts[,] the insurer's experts were unreasonable[,] [or] the insurer failed to conduct a thorough investigation.' " (*McCoy v. Progressive West Ins. Co.* (2009) 171 Cal.App.4th 785, 793, citations omitted.)

Here, defendants presented evidence that there was a genuine dispute that the pipe rupture (a covered loss) was not the efficient proximate cause of the damage, and that the efficient proximate cause was earth movement or settlement (an excluded loss). Specifically, defendants presented evidence that its experts, WJE and Ninyo & Moore, concluded the damage to the building was caused by earth settlement and not the pipe rupture.

Plaintiff makes much of the fact that there was evidence defendants initially decided the damage may have been covered, and only sought additional expert opinions after the estimate for repairs exceeded their expectations. However, plaintiff ignores evidence that both AGI and WJE noted extensive pre-existing settlement damage to the building in their initial reports, and cautioned that further investigations and testing should be conducted to determine the cause of the damage and the necessary repairs. Moreover, when asked to provide a repair estimate, Mr. Machin cautioned there were many "unknowns," and further investigation was warranted. Mr. Israel similarly

19

guarded his initial coverage evaluation, cautioning there were other possible causes of the damage, and that the experts should attempt to apportion the damage between the various causes, including pre-existing earth movement and the pipe rupture.

Plaintiff also complains that WJE changed its opinion in its September 13 proposal, without conducting any further investigation. Nothing in the record supports this inference. WJE had participated in the September 9 conference call, where Mr. Machin raised concerns about his ability to write an accurate repair proposal based on the number of "unknowns" before WJE drafted its proposal. We can infer no dishonesty or unreasonableness from these facts.

Plaintiff also makes much of Mr. Koch's email approving the $15,000 budget for an additional expert report and stating it seemed expensive "in pursuit of coverage denial," and the claim file notes stating litigation was anticipated. We do not find it is reasonable to infer bad faith from the email or from these file notes. Mr. Koch may have been of the opinion that defendants already had enough expert information on which to deny the claim, and another $15,000 was too much to spend, but he approved the budget anyway, and defendants' coverage denial was indisputably based on the additional expert report. As for the file notes, litigation often results from coverage denial, and file notes stating the obvious are not reasonably viewed as evidence of bad faith.

We agree with the trial court's assessment that none of plaintiff's evidence raised a triable issue that this was not a genuine coverage dispute. There is no dispute that defendants based their claim denial on the final expert report, and there is no evidence that report was contrived or false. As the trial court

aptly stated, "Initial opinions are often superseded by further investigation."

### b. Section 437c, subdivision (h)

Section 437c, subdivision (h) provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication, or both, that facts essential to justify opposition may exist but cannot, for reasons stated, be presented, the court shall deny the motion, order a continuance to permit affidavits to be obtained or discovery to be had, or make any other order as may be just." A party seeking continuance or denial of a motion under section 437c, subdivision (h) must show that the facts to be obtained are essential to opposing the motion, that there is reason to believe such facts may exist, and that additional time is needed to obtain these facts. (*Wachs v. Curry* (1993) 13 Cal.App.4th 616, 623.) The party's supporting declarations must show: "(1) 'Facts establishing a likelihood that controverting evidence may exist and why the information sought is essential to opposing the motion'; (2) 'The specific reasons why such evidence cannot be presented at the present time'; (3) 'An estimate of the time necessary to obtain such evidence'; and (4) 'The specific steps or procedures the opposing party intends to utilize to obtain such evidence.'" (*Johnson v. Alameda County Medical Center* (2012) 205 Cal.App.4th 521, 532, italics omitted.)

Here, the sum total of plaintiff's argument on this point in the trial court was one heading, and two sentences, at the conclusion of plaintiff's opposition brief: "Other facts may exist essential to denial, however, Defendants refused to answer 53 questions in PMK deposition. Denial is proper pursuant to CCP 437(c)(h)." Counsel's supporting declaration was very general, and did not explain why the answer to any of the

21

questions at the PMK deposition was essential to opposing the summary adjudication motion.  The only testimony that plaintiff complains it was unable to obtain was an opinion about whether denial of the claim was "appropriate," and we see no reason to conclude the PMK's opinion, whether yes or no, would be a material fact, or that it was essential to oppose the motion.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.


GRIMES, J.


WE CONCUR:


BIGELOW, P. J.


WILEY, J.

22

Filed 4/16/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| 501 EAST 51ST STREET, LONG-BEACH-10 LLC,<br><br>    Plaintiff and Appellant,<br><br>      v.<br><br>KOOKMIN BEST INSURANCE CO., LTD., et al.,<br><br>    Defendants and Respondents. | B293605<br><br>(Los Angeles County Super. Ct. No. NC061176)<br><br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION**<br><br>[No change in judgment] |

THE COURT:

    The opinion in the above-entitled matter filed on April 2, 2020, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

    There is no change in the judgment.

_____

BIGELOW, P. J.          GRIMES, J.          WILEY, J.